IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 11, 2018 Session

## COUNTRY MILE, LLC, ET AL. v. CAMERON PROPERTIES

**Appeal from the Circuit Court for Williamson County**
**No. 2016-471      Joseph A. Woodruff, Judge**

_____

### No. M2017-01771-COA-R3-CV

_____

Cameron Properties, LLC ("Landlord") appeals the judgment of the Circuit Court for Williamson County ("the Trial Court"), which, *inter alia*, found Landlord in breach of a lease agreement with Country Mile, LLC ("Country Mile") and awarded a judgment against Landlord of $18,037.75. Landlord raises issues, among others, regarding standing, whether Country Mile breached the lease agreement by failing to pay rent, and whether Landlord is entitled to an award of all of its attorney's fees. We find and hold, that Country Mile, Well North, LLC, and Dean Pennington all had standing; that the Trial Court did not err in finding the tenants in breach but that Landlord had breached the lease agreement first; that the tenants proved $18,037.75 in damages from Landlord's breach; and that pursuant to the lease agreement Landlord is entitled to an award of reasonable attorney's fees due to the tenant's breach. We affirm the Trial Court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Deana C. Hood and Robert C. Ashworth, Franklin, Tennessee, for the appellant, Cameron Properties.

Thomas J. Boylan, Franklin, Tennessee, for the appellees, Country Mile, LLC; Dean Pennington; Well North, LLC; and Zacari Pennington.

# OPINION

## Background

On September 8, 2015, Country Mile and Landlord entered into a Tenant Agreement ("the Contract") for Country Mile to lease space at 400 Downs Boulevard in Franklin, Tennessee ("the Premises") from Landlord for the purpose of operating an Anytime Fitness business. Don Cameron ("Cameron") executed the Contract on behalf of Landlord and Dean Pennington ("Dean")[1] executed it on behalf of Country Mile. In pertinent part, the Contract provides:

> **3. Rent Commencement Date. --** Rent shall commencement [sic] after tenant receives an occupancy permit from the city of Franklin, but no later than 60 days after Handover date. In the event the landlord hasn't delivered the space within 8 months of lease execution the tenant has the right to terminate the lease.
>
> **4. Hand-Over Date:** Landlord will Hand-Over the Premises to the Tenant no later than 60 days after final stamped drawings are delivered to Landlord by Tenant from the City of Franklin. For every 30 days over the initial 60 days Landlord fails to handover the space, Tenant shall receive 1 month free months' rent. To be taken at the initial term of the lease.
>
> **5. RENTAL.**
>
>> A. As gross monthly rental for the Leased Premises, Tenant hereby agrees to pay to Landlord without deduction, set-off, or prior notice or demand in lawful (legal tender for public or private debts) money of the United States of America according to the following schedule:
>>
>> **$20.00 per sq. ft. With annual gross rent increases of 3% thereafter** Starting in year 3. **To take place each year on the first day after the anniversary of Commencement Date.**
>>
>> B. Rental is payable monthly in advance installments commencing on the Commencement Date, and continuing due and payable on the first day of each and every month for the entire term of the Lease, except as adjusted herein, at the office of: **Cameron Properties.**

---

[1] Because both Dean Pennington and Zacari Pennington are heavily involved in this case, we refer to them by their first name rather than as 'Pennington' simply to avoid confusion with no disrespect intended.

**1503 Columbia Ave. Franklin TN 37064**, Rent checks made out to: Cameron Properties.

\* \* \*

**15. ASSIGNMENT AND SUBLETTING.** Tenant covenants and agrees not to assign or sublet said Leased Premises or any part of same or in any other manner transfer the Lease without the written consent of the Landlord, but such consent to sub-Lease or assign shall not be unreasonably withheld by Landlord. In the event of such subletting or assignment, Tenant nevertheless shall remain liable for the payment to the Landlord under and compliance [sic] with all of the terms and conditions of this Lease.

\* \* \*

**17. DEFAULT BY TENANT.** In the event of a breach as hereinafter defined by the Tenant of any of the terms or conditions of this Lease, Landlord shall have the right at Landlord [sic] sole discretion to annul and terminate this Lease upon written notice sent by certified mail to the Tenant. At any time after such termination, the Landlord may re-let the Leased property in whole or part in the name of the Landlord. No such termination of this Lease shall relieve the Tenant of its liability and obligations under this Lease and such liability and obligations shall survive any such termination. The occurrence of any one of the following events shall be considered a breach of this Lease:

> a. In the event the Tenant shall fail to pay one or more of said installments of rents it [sic] becomes due and payable.

\* \* \*

**23. ATTORNEY'S FEES AND INTEREST.** In the event it becomes necessary for Landlord to employ an attorney to enforce collection of the rents agreed to be paid, or to enforce compliance with any of the covenants and agreements, herein contained, Tenant shall be liable for reasonable attorney's fees, costs and expenses incurred by Landlord, and in addition, shall be liable for interest at ten percent (10%) per annum on the sum determined to be due by reason of breach of this Lease, such interest to run from the date of breach of the Lease, whether or not litigation is involved.

3

* * *

**42. SPECIAL CONDITIONS:**

A. Landlord will deliver the leased premises on the Commencement Date on or before December 1st. [sic] or at such time thereafter [sic] Landlord completes the Tenant Improvements described on Exhibit C.

B. Tenant Improvements delivered by Landlord are attached to this lease as Exhibit C.

C. Finish Improvements required by the Tenant shall be listed and Attached to this lease on Exhibit D.

D. Tenant is responsible for the costs pertaining to the costs of permits and fees charged by the City of Franklin to build out this space. In addition Tenant is responsible for the costs and fees pertaining to the architectural drawings, engineering drawings or any other plans or professional services required by the city of Franklin to permit the construction of this space.

E. The landlord shall grant exclusive use for a gym or fitness [sic] to Anytime Fitness, including personal training, yoga and similar use

* * *

**Exhibit C.**

**Tenant Improvements Delivered by Landlord.**

Landlord agrees to deliver the following improvements per Anytime Fitness current Design Book and Franchisor specifications Build Plans on or before the Hand-Over date.

1. Deliver the space roughed in to the specifications described in Build Plans, the Anytime Fitness current Design Book and Franchisor specifications and delivered to Landlord by Tenant.

2. Deliver the space roughed in with all electrical wiring, breakers, main breakers, cutoffs, plugs receptacles and covers, electrical boxes and connectors needed for Tenant to install its own light fixture or electrical apparatus. Tenant is responsible for that portion of labor and cost to attach any light fixture or apparatus to the system.

3. Deliver the space roughed in with all plumbing systems needed per franchise requirements for Tenant to install its own plumbing

4

fixtures and plumbing apparatuses. Tenant is responsible for that portion of labor and cost of such to attach any plumbing fixture or plumbing apparatus. Landlord will install the Shower inserts needed by Tenant as part of the framing rough in, and install all toilets and sinks

4. Landlord will rough in the space and deliver it to the Tenant per specifications described in, Anytime Fitness Design Book and franchisor specifications. .[sic] That buildout shall be delivered in a timely manner complete with all framing and drywall installed and wall [sic] sanded and ready for paint.

5. Deliver space with the necessary HVAC unit on roof top and deliver it throughout the space,.[sic]

**Exhibit D.**

**Finish Improvements required by the Tenant**

After Landlord delivers the space with improvements described in Exhibit C. Tenant agrees to finish the space as described in the Build Plans submitted and approved by the City of Franklin for the subject premises to obtain a satisfactory occupancy permit from the city of Franklin.

1. Install all plumbing fixtures and apparatus needed to complete the premises per build plan.
2. Install all electrical fixtures and apparatus needed to complete the space per build plan, excluding shower inserts.
3. Install all flooring per build plan.
4. Install baseboard trim per build plan.
5. Paint and decorate the space as desired or required by Build Plan
6. Install any signage required or desired.
7. Any other item not mentioned in the lease is the responsibility of the Tenant.

Anytime Fitness began operating in the Premises on August 1, 2016. In September of 2016, Landlord filed a detainer action in the General Sessions Court for Williamson County ("the General Sessions Court") against Country Mile, Well North, LLC ("Well North"), Dean Pennington, and Zacari Pennington (collectively "Tenants"). Tenants attempted to have the case removed to the Trial Court, but their motion was denied. The detainer action was tried and a judgment was entered in favor of Landlord. Tenants appealed the General Sessions Court judgment to the Trial Court.

Country Mile and Dean also filed a breach of contract action in the Trial Court alleging, in part, that Landlord had breached the Contract by failing to meet the hand-over date and by failing to complete its required improvements to the Premises. In December of 2016, the Trial Court ordered the appeal from the General Sessions Court be consolidated into the breach of contract action. The case proceeded to trial without a jury in March of 2017.

At trial, Cameron testified that he is a partner in Cameron Properties with his brother Tim. Cameron Properties is in the business of leasing properties in middle Tennessee. Cameron has been in this business for over 30 years. He testified that he signed the Tenant Agreement as the landlord on behalf of Cameron Properties to lease the Premises to Country Mile. Cameron explained that he hired an agent, Tom Lochbihler, to negotiate the Tenant Agreement. Cameron believed he was entering into an agreement with Country Mile negotiated by Dean and Zacari Pennington ("Zac").[2] Cameron testified that he got a guarantor to the Contract, Dean. He testified that there also was supposed to be a guarantee from Zac and that it was a mistake that there is not one in the Contract. Cameron stated that rent was to begin on August 1, 2016, the day Anytime Fitness opened for business.

Cameron admitted that he agreed to Dean and Zac running an Anytime Fitness business in the Premises. He also admitted that Landlord cashed the security deposit check, which came from Well North not Country Mile. Cameron, however, claimed that he personally never saw that check. Cameron was asked if he ever gave notice that he did not consider Well North the tenant, and he admitted he had not. Cameron also admitted that he executed Equipment Waivers and Disclaimers – Key Equipment Finance documents ("Equipment Waivers"), which stated that the Premises are occupied in whole or in part by Well North. Cameron admitted that he did not read the Equipment Waivers. He claimed he did not know Well North was involved until "this thing kind of blew up in all honesty," but admitted that the Tenants didn't try to hide that Well North was involved. Cameron also admitted that the information was in plain view in the documents he signed, and he could have asked about it.

The initial agreement was for Tenants to lease 4,597 square feet. Cameron testified that ultimately Landlord agreed to give them 5,000 feet. He explained that he offered them space next to Domino's, which would have given them 6,000 feet, but Tenants refused. As a result of this refusal, a wall between Suites 110 and 120 was moved approximately seven feet to the left into Suite 110. Cameron testified that the space Tenants are occupying is actually 5,080 square feet.

---

[2] See footnote 1.

6

Cameron admitted that Landlord agreed to put in the shower stall, but stated it did not agree to put in sinks and toilets. He was asked how the sentence about the Landlord installing the sinks and toilets got into the Contract if Landlord did not agree to installing the sinks and toilets, and Cameron stated: "That is a good question." Cameron stated that to his recollection there was no discussion about sinks and toilets. Cameron agreed that the provision with regard to sinks and toilets was in the Contract when he signed it. Cameron testified that installing sinks and toilets is trim-out work not rough-in work.

Cameron claimed that Tenants agreed to pay to move the electrical panels. He testified that he met with Jerry Caldwell, Kerry Hosford, and Zac on the site around March of 2016 to talk about the panels. Cameron told them that if they moved the panels they would have to pay because he did not believe they needed to be moved. Cameron testified that he thought that they agreed during that meeting that Tenants would pay if they moved the panels. Cameron admitted, however, that neither Dean nor Zac ever told him that they would pay to move the panels. Cameron testified that Dean and Zac looked at the site before signing the lease and that the electrical panels were there at that time. Cameron testified that it was Landlord's responsibility to rough-in for electrical, but he stated that moving electrical panels is not rough-in work.

Cameron testified that the Contract was signed in October of 2015, but that they didn't get building plans until sometime between February 21, 2016 and March 1, 2016. Cameron claimed that the hand-over date was around May 20, 2016. Cameron agreed that it would not be possible to finish the Landlord's portion of the work listed on Exhibit C if the Tenants did not do their portion as listed on Exhibit D because of the way construction works. He testified that it was Landlord's responsibility under the Contract to install the sprinklers. The sprinkler plans were approved April 4, 2016, and the sprinkler system could not be installed until they had approved plans. Revised electrical plans were approved May 16, 2016. Cameron testified that Anytime Fitness asked for the electrical plans to be changed.

Cameron testified that Country Mile never requested that it be allowed to assign the lease to Well North. He stated that if they had, he could have asked for a personal guarantee from the members of Well North. Cameron never agreed to allow Country Mile to assign the lease.

Landlord did not receive rent on time for August 1st, September 1st, October 1st, or November 1st of 2016. The rent for August, September, October, November, and December of 2016 was tendered to Landlord's attorney in November of 2016. That check had not been cashed as of the time of trial.

7

Dean testified that he is a member of Country Mile along with his wife, Teda. He along with his wife, his son Zac, and Zac's wife Olivia are members of Well North. Dean explained that the LLCs were formed for the purpose of holding Anytime Fitness franchises. Country Mile was the original franchisee of the Anytime Fitness to be operated at the Premises. Dean explained that the franchise agreement was transferred to Well North in November of 2015 when 50% was sold to Zac and Zac's wife. Country Mile executed a transfer agreement wherein Well North acquired and assumed Country Mile's rights and obligations under the franchise agreement with Anytime Fitness. Dean testified that they hired an agent from Franchise Real Estate, Richard Parnell, to negotiate the Contract. He explained that Richard Parnell is from Anytime Fitness corporate in Minnesota.

Dean signed the Contract. Country Mile is the tenant and is obligated to pay the rent. Dean also signed the personal guaranty. Dean testified that it is his understanding that he remains personally liable under the guaranty. Well North provided the down payment on the Contract. Cameron never said anything to Dean about Well North being the source of the deposit check. Dean testified that Country Mile never assigned the lease to Well North. Country Mile never has subleased the Premises. Dean testified that they never had any conversations with Cameron with regard to the fact that Country Mile was to be the tenant, and Well North was to be franchisee.

Dean testified that the lease payments "originate from me to Well North" as did the initial payment to Landlord and the payments to David Wyles Construction. Dean stated he "put the money in Well North and they paid it." Dean was asked how Country Mile and Well North account for expenses related to the operation of the Anytime Fitness located at the Premises, and he stated: "Largely for organizational purposes we created those 2 LLC's. I fund both of them. I'm the beneficiary of both of them and have the responsibility of both of them. But I wanted to create a separation there from our other territories."

Dean testified that Zac was in charge of the build out for the Tenants. He explained that Anytime Fitness corporate gave them the general layout, and they then hired an architect to have professional drawings made for the build. Zac acted as the project manager.

Dean testified that drawings were submitted to Cameron around February 21, 2016. He stated that they anticipated that once they got approval for the plans, which happened around March 1, they would be able to have the space in two months. That did not happen. Dean stated that Landlord took "2 and a half times as long as he promised. It took 5 months."

8

Dean testified that there wasn't an actual hand-over date because the work still had not been completed as of the time of trial. Dean testified that the drywall is not complete. He contended that the light connections were done improperly. He also stated that the general contractor was still in the space doing work in July within days of when they opened. Dean claimed that "we have never received any notice of verbal, written or otherwise that the property is handed over." He was asked if the Contract required Landlord to give them written notice of hand-over, and Dean stated: "Not that I'm aware of." Dean testified that he attempted to contact Cameron about the delays and left voice mails, but the calls were not returned. Dean admitted that the Anytime Fitness business has been operating at the Premises since August 1, 2016 and earning revenue. Dean stated that when they opened on August 1st, he "didn't think [the Premises were] in good condition but I felt compelled to accept it because we had to get the doors open."

Dean testified that he visited the site a "couple of times a week." Jerry Caldwell was the general contractor in charge of the build out for Landlord. Dean's interactions with Jerry Caldwell were "just a friendly chit chat type of thing."

Dean testified that the last conversation he had with Cameron was prior to the build out when he, Zac, and Cameron met at the space because Cameron wanted them to move their space to the left to be adjacent to Domino's instead of the chiropractic office. Dean and Zac did not agree to move the space. Dean stated that when Cameron testified, Cameron was mistaken because the meeting was never about moving a wall. Dean stated that the suites were wide open, and Cameron "wanted to just have us re-draw it all and put it down on the left end. And because of the time and expense we didn't want to do that." Dean stated: "We had already leased for 5,000 square feet. We were not asking for more space. I just think [Cameron] is confused about it." Jerry Caldwell was not at that meeting.

Dean never met with Cameron or Jerry Caldwell about moving the electrical panels. He stated he never discussed the electrical panels with Cameron. Jerry Caldwell never told him that moving the panels needed to be paid for. Dean testified that he never agreed to pay to move the panels.

Dean testified that initially they hired David Wyles Construction to do the finish work that was the Tenant's responsibility, but then they also hired them to do the work that Landlord had not completed. Dean testified that they ended up spending $39,000 "exclusively for finishing what Cameron Properties was delinquent in doing."

Dean testified about alleged business losses claimed by Tenants and stated that they kept good notes and they:

9

were actually able to identify 83 people that as part of their reason for not joining was that it had taken so long to get it built out. Repeatedly on a more than a weekly basis, we were repeatedly being told, well, you said you were going to be ready to go June 1st. You said you were going to be ready to be open July 1st. And we just had a whole bunch of people that ended up not joining because they got tired of waiting. And just went somewhere else. . . . Well, Mr. Cameron was so delinquent or Mr. Caldwell was I guess as the builder, he was so delinquent in getting his work done, that we were running up against members that had joined us, that they were beginning to tell us we want to drop our membership because you are not getting open. So we were faced with, do we keep waiting on Mr. Caldwell to get the work done, or do we hire our own guy that is going to do the finish work, David Wiles [sic] Construction to come in and get it done. And the longer it went the more pressure we felt, we have got to get this thing open. We have people, we sold 150 memberships prior to opening and these people were pressuring us. You are not open, you are not getting open when you say.

And so we finally decided we are going to have to pony up the money and get the place open.

Zac testified at trial that he is Dean's son. Zac helped negotiate the Contract, but he did not sign the Contract. He testified that he did not write his name at the top of the first page of the Contract and that is not his signature at the top of the first page. Zac also stated that he did not write his name in the notary section. Zac also did not sign the guaranty.

Zac was asked about an email from Tom Lochbihler, Landlord's agent, to Richard Parnell, Tenant's agent, dated September 16, that stated: include the toilet and sink rough-in. Zac testified that he believed that this email was Tom Lochbihler responding to a previous email from Richard Parnell asking Landlord to deliver sink, toilet, and water heater and that Tom Lochbihler was agreeing to do the sinks and toilets.

Zac testified that he was at the job site "if not every day, every other day." He testified that the City of Franklin granted approval on the drawings on February 16, 2016, and Zac provided the approved drawings to Landlord on February 21, 2016. Zac was asked if it was his understanding that these were the final approved drawings that the Contract required be provided to Landlord, and he stated: "Yes, absolutely. These are the drawings we all agreed to be in construction and pulling permits from." Zac testified that because they handed over approved final drawings to Landlord on February 21, 2016, Tenants contend that the hand-over date should have been April 23, 2016.

Zac testified that he was told Cameron was not happy and wanted them to shift the space, so he set up a meeting with Cameron in the space to discuss the matter. That meeting occurred during the week of February 21, 2016 between Cameron, Zac, and Dean. Cameron wanted them to move from the space next to the chiropractor to the space next to Domino's, and they were not willing to do so. Zac stated: "At the end of that discussion Mr. Cameron did agree to proceed forward with the plans as drawn and approved by the City of Franklin." Permits were pulled a few days later and construction began.

Cameron did not talk to them about the electrical panels at that meeting. Zac did not hear that the electrical panels were a problem until after they opened for business. He was told that Cameron testified that Cameron had told them they would need to pay to have the panels moved, and Zac stated: "That is a complete fallacy." He testified that there was no discussion during the meeting in February about moving the electrical panels and who would pay for that move. Zac explained that the panels had to be moved to conform to the drawings because one would have been in a bathroom and one would have "split the demising wall." He stated: "Someone had to move them. And Mr. Cameron had agreed to follow the approved set of drawings that were given to us by Franklin, which showed them in the utility closet."

Zac testified that some of the improvements for which Landlord was responsible remain incomplete. He testified that he had to have his people do the sinks and toilets, some rough drywall work, and some sanding to prep, all of which Landlord was supposed to do. Zac stated: "sinks, toilets, those are not completed. There is also a series of electrical items not completed. We had to come in and rework panels. We had to finish panels. There were plugs and receptacles in the whole building that were never even put in." Zac testified that Jerry Caldwell told Zac that they were not going to run electrical to the exterior emergency lights underneath the awnings as called for in the plans. Zac also testified that Jerry Caldwell told him in July that they were not going to install any sinks or toilets. Zac testified that Jerry Caldwell told him that the electrician, Kerry Hosford, would not be finishing his work and that is why Zac told his "guy to come in and do it."

Zac testified that the Premises failed an inspection by the Franklin Fire Department Inspector on July 25, 2016. He testified that the fire inspector gave them a temporary Certificate of Occupancy to allow them to move in equipment after having them secure sprinkler heads to the grid. They received the actual Certificate of Occupancy on August 1, 2016.

Zac estimated that they lost 83 clients due to: "The slow progress and our need to redirect funds that we were assigned to use for a presale to pay for construction items that

11

Mr. Cameron did not complete. It depleted our presale efforts and ability to close contracts." He was asked how much those clients would have been worth over the life of a contract, and he stated:

> At the time we were doing presale, 90 percent of the contracts we were signing were 24 month agreements. Those 24 month agreements are for two years. The average monthly value of that contract we sold was $42. So $42, I will say 90 percent of those contracts of the 83 would have sold would have been a value of $42 a month times 24, gives us roughly, I belive [sic] we submitted it in evidence somewhere here, it is roughly in the 85 to 95 to $100,000 range.

Zac also stated: "We do have customers that simply never decided to pay us after their contracts went into effect, . . . . We had roughly about 30 members that went into default the day we opened or the month thereof." He explained that the 83 number represents communications that they had with people who never would commit. Zac stated that when this litigation started the number was closer to 90 or 95, but because some of those people have since joined the gym, they deleted them from the number of lost contracts. Zac was questioned about projected sales goals, and he testified that working with Anytime Fitness corporate they were gauging between 200 and 300 presales for this location. He testified that they signed up 200 members.

Jerry Caldwell ("Caldwell") testified at trial. Caldwell is a contractor and builder. He was hired as a supervisor for this job. Caldwell has known Cameron and Tim Cameron for most of his life and has built things for them in the past. He was partners with them building some homes in the 1990s.

Caldwell stated he was hired to: "go in and get everything ready, the grade work, get the plumbing and electrical in the slabs, pour the concrete, build the metal stud walls, rough-in all of the electrical, plumbing and heat and air unit, ducts, and to come back and hang and finish the sheetrock." He was asked what the electrical and plumbing rough-in would entail and he stated:

> Well, a rough-in is just where you got to go in and get all of your stuff in the slabs that you need stubbed up before you pour your concrete. And then after you do that you get your concrete poured. And then you come back and layout all of your metal stud walls, build all of your metal stud walls. And then your electrician comes in and starts roughing in anything that goes down into the metal stud walls and around the metal stud walls, and get all of his pipes and conduits and all of his wire pulled to a

certain location where he has plugs and switches and everything in the walls.

> And at that point then the heat and air guy, he comes in and hooks up all of his units the duct work, runs all of the duct work off into the building. And the plumber comes back, if you need to put in certain kinds of shower stalls he has to put them in on the rough-in because you have to have them inside to put the sheetrock around them when you are hanging sheetrock. And basically that is it on the rough-in.

Caldwell testified he was given a piece of paper that told him what was to be done with regard to "roughing-in the plumbing and electrical, pouring the concrete and everything we had to do." He could not recall who had given him that piece of paper. At trial, Caldwell was able to identify the piece of paper as a copy of Exhibit C of the Contract. Caldwell admitted that he probably had final say on what Landlord was going to install and how it was to be done. When roughing-in, Caldwell planned to pull conduit for all of the switches and plugs, install a shower, and put boxes in the walls for switches and for plugs. Caldwell explained that usually he would not hang sheetrock as part of a rough-in, but the Contract required it, so that is what he did. Caldwell did not think Exhibit C said he was to install sinks and toilets.

Caldwell explained that when they were done with the rough-in, Caldwell would leave to allow the tenant to trim out. He stated that trim out would include:

> Trim out items would be putting in commodes, sinks, faucets, light fixtures, plugs, switches, any breakers in the panels. Now we had one panel that had breakers in it because we had it hot but that was before this job ever started. And you know, it had a lot of breakers in it, and we, you know, we worked off of that panel for the electricity while we was working in the building.

Caldwell further stated: "Trim out would be putting the plugs and switches, hanging light pictures, your toilets, your sinks, you commode, I mean that would be a trim out."

Caldwell testified that they finished their work at the end of May. He explained that they do not pull low voltage wire, but they did put boxes on the walls for the low voltage wires to be pulled. They installed the duct work and the exhaust fans. Caldwell testified that Landlord was not responsible for installing plugs and switches or for installing sinks and toilets, and Landlord did not install plugs, switches, sinks or toilets.

Caldwell explained that they never put plugs in until after the drywall is finished and painted. He agreed that in order for a landlord to put in switches and plugs, sinks and toilets their crew would need to stop work and wait for the painting to be done by the tenant and then come back to do that work.

Caldwell testified that Zac wanted all of the switches put in the front office despite the fact that the plans called for them to be in different locations. Caldwell was asked about moving the switches, and he testified:

> But Mr. Hosford, when he roughed it in, he roughed in everything by what the plans called for. That was their plans drawn. We didn't draw the plans. They give us the plans and that is what we roughed it in by. But it showed some of the switches in the back, and the back hallway and some in the front office. And then Zac wanted all of them in the front office, and that is when Mr. Hosford had to take all of them out of the back and rework all of his piping, get all the wires to make sure he got all the switches in the front office.

Doing this cost more money and took more time. Caldwell agreed this was out of Landlord's control.

Caldwell admitted that someone on behalf of the Landlord used the wrong kind of fire caulk, but he stated that his people had not done that. The use of the wrong fire caulking held up obtaining the Certificate of Occupancy. Caldwell testified that he supervised the corrective work for all of the failed inspections, and all of the necessary corrections were made.

Caldwell testified that Cameron gave the approval to move the electrical panels, but Cameron told Tenants they would have to pay to move the panels. Caldwell knows this because Cameron told him so. Caldwell was asked if he heard Cameron say that to Tenants, and he stated: "Yes, sir. We was standing over there, yes, sir." Caldwell was not present when they talked about shifting the space, but was present when they talked about moving the electrical panels. He stated that the electrical panels had to be moved because one of them "hit dead center of a wall," and "one of them was in a bathroom area." Cameron told Caldwell, Kerry Hosford, and Zac that he was not going to be responsible for paying to move the panels. Caldwell didn't hear Zac say anything during that meeting. Caldwell never heard Zac say he would pay to move the panels, but Caldwell heard Cameron say he would not pay.

Caldwell was shown an exhibit depicting the suites pre-divided with electrical panels and HVAC units pre-installed according to the lines of each pre-divided space and

was asked about changes that might move dividing walls and asked if moving those walls would cause changes to the Landlord's scope of work, and he stated:

> With the square footage they are showing here, the wall is built, the firewall, well if you [sic] standing in front to the left of the building it should have been built on the column line. If that wall had been built on the column line where it should have been built, it would have created a lot less problems. One service would not have to be moved at all, and the firewall would have worked a lot better putting it on the column line. But the drawings made us move six and a half foot or seven foot past that column line, and it hit dead center of a window which you very seldom do but that is what the drawings called for and that is what we did.

* * *

> When we started honestly I thought they were getting two bays plus another piece of a bay on the other side, but I thought the wall would go where the column line is. That is where we thought it would go. We got to looking at their plans and coming up with our measurements, they bought the wall way past the column line and it hit out dead center of the windows in the last bay. So we actually went six or seven feet more and when that wall was built it hit right dead center of a panel in the back and we had to move that panel too.

Caldwell agreed this was a significant amount of work and that it took some time to move the panel.

Caldwell was asked about photos submitted from January of 2017 showing missing drywall in the Premises, and he stated: "I thought we finished all of that. If we missed that, that would be my mistake. I don't remember, thought we finished out all of the corners and everything. We had to go back over there and redo some stuff around those windows." Caldwell agreed that the picture showed a gap in the finishing of the drywall.

Caldwell testified that the electrician, Kerry Hosford, stopped working because he discovered another electrician on the job. He stated: "Kerry Hosford is a good man, he is not going to let somebody work off of his license and stuff," so he removed his permit and left.

Kerry Hosford ("Hosford") testified at trial. Hosford has been a licensed electrician for over 40 years. He was asked to define an electrical rough-in, and he

stated: "On commercial you put your conduit, your boxes to pull your wire and the conduit, make all your joints up, and you are ready for the trim out. . . . I never put on switches on a rough-in." Hosford further stated: "trim out would be installing plugs, switches, plates, breaker, light fixtures and et cetera, whatever." Main breakers, cutoffs, plugs, receptacles, and covers are not rough-in items. Hosford testified it would not be possible to install electrical wiring, breakers, main breakers, cutoffs, receptacles and plugs prior to the rough-in inspection. Breakers would be installed as trim-out after the dry wall was painted.

Hosford met with Cameron, Caldwell, and Zac at the site to discuss moving the panels. Hosford explained that the panels had to be moved because "2 panels were in the middle of a wall and the third panel was in a bathroom." He testified: "The only discussion was Mr. Cameron and Mr. Pennington were there, and Mr. Cameron said that the panels had to be moved and Mr. Pennington would have to be responsible for it, for the payment of it." Hosford never heard Zac respond to that. Hosford considered moving the panels to be rough-in work. Hosford billed $4,492 for the moving of the panels. It was his understanding that Tenants were going to pay that bill. Hosford had not been paid for that work as of the time of trial.

Hosford testified that he is not licensed to install low voltage electrical wiring, but he is required to rough-in boxes for the low voltage. He testified that "electrical and low voltage are 2 different things." Hosford testified that Zac made "changes on the fan controls, 3 switches in the hallway, and one switch on the right side off the backside where the bathrooms were." Zac wanted them put in the manager's office.

Christopher Lynn Bridgewater ("Bridgewater"), the Director of the Building & Neighborhood Services Department for the City of Franklin, testified at trial. Bridgewater's department formerly was known as Codes Administration. Bridgewater testified that as far as the City of Franklin is concerned the final stamped set of building plans for the Premises was approved on May 16, 2016. He explained that if there are no amendments to plans, then the first set of plans would also be the final stamped set. Bridgewater testified there were three submittals for this project, the initial one, the second one that made corrections to allow for obtaining the building permits, and the third one when they made their electrical revision. Bridgewater explained that the initial submittal was declined so changes were made leading to the second submittal, which was approved. Bridgewater testified that Tenants could not have obtained a Certificate of Occupancy based upon the second submittal because the electrical inspection would have failed.

After trial, the Trial Court entered its extensive Memorandum and Order on May 22, 2017 finding and holding, *inter alia*:

Cameron Properties had *actual notice* of Well North's participation in Country Mile's business venture throughout the course of the business relationship between parties. The security deposit check was issued to Cameron Properties by Well North (Ex. 1); and on December 17, 2015, Cameron Properties executed three Equipment Waiver and Disclaimer documents for the benefit of Key Equipment Finance, which released all rights for Cameron Properties to attach a lien to Tenants' equipment located on the premises for satisfaction of any potential unpaid rent. Each of these documents identifies Cameron Properties as the "Owner/Landlord" and Well North, LLC, as the "Lessee." (Ex. 2.)

When commercial landowners agree to provide commercial space in a shell building with an unfinished interior to a tenant with specialized design requirements, the parties allocate certain building responsibilities to the landlord or owner and others to the tenant. Customarily, owners have the obligation of "roughing-in" certain core construction elements such as electricity, plumbing, HVAC; and tenants are allocated responsibility for "trimming-out" the remaining construction necessary to outfit the leased premises in a manner suitable for the intended commercial business.[3]

In the construction industry, rough-in electrical work for commercial space is understood to mean the installation of junction boxes which bring power into the building; the installation of conduit in the designed space; pulling of wires in the conduit; and the installation of junction boxes with stubbed wires in the contemplated location of switches, outlets, and fixtures. Trim-out for electrical work is understood to mean the installation of plugs, switches, plates, and fixtures.[4]

Similarly, rough-in plumbing is understood to mean the installation of sub-foundational pipes to bring water into the building and to carry wastewater away; the installation of water supply lines running toward the designed location of fixtures; the installation of wastewater piping running away from these designed locations; the installation of shower pans and inserts; and, depending upon applicable building codes, the installation of fire-suppression sprinkler lines. Trim-out of plumbing typically involves the installation of fixtures such as sinks, toilets, water-heaters, and drinking fountains.[5]

---

[3] The Court credits the testimony of Donald Cameron, Jerry Caldwell, and Kerry Hosford.
[4] *Id.*
[5] *Id.*

17

Rough-in of interior walls is customarily understood to require the placement of metal track or wood framing, while trim-out is understood to be the installation, finishing, and painting of the drywall and baseboards.[6]

Rough-in of HVAC foundational work is customarily understood to mean the installation of air handling equipment, A/C and furnaces, air-ducts, and filter housing. Trim-out typically encompasses installation of floor or ceiling registers.[7]

During the course of construction for the interior of a commercial space, certain work, such as painting of the walls and the installation of floor tiles, has to be done prior to other work, such as the installation of electrical switches, outlets, and plumbing fixtures.[8] Thus, in order for the requisite construction to be completed successfully, there is a natural progression which must be considered when allocating rough-in and trim-out responsibilities.

The Tenant Agreement in this case represents a significant departure from the customary allocation of landlord and tenant construction responsibilities. For example, (1) Landlord agreed to install electrical plugs, receptacles, and covers; (2) Landlord agreed to install all toilets and sinks; and (3) Landlord agreed to complete all framing, and install all dry-wall "sanded and ready for paint." All of these responsibilities are typically allocated to the tenant, but were otherwise bargained for during the course of contract negotiations.[9]

* * *

Well North tendered the security deposit check in the amount of $7,662.00 on or about October 12, 2015. Cameron Properties accepted and deposited Well North's check as the security deposit.[10]

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] Exs. 18, 19, 20, and 21. The original letter of intent sent to Landlord's agent was more consistent with the customary allocation of construction responsibilities between owners and commercial tenants. The business reasons driving the decision to depart from this allocation were never explained by the parties and the Court will not speculate what they were. The Court's task is to determine the intent of the parties expressed in their unambiguous written agreement, and enforce it.

[10] Testimony of Lesa Hay.

On February 16, 2016, the City of Franklin (the "City") approved the Anytime Fitness Tenant Build-Out Plans dated January 12, 2016, which were prepared by Studio Oakley Architects, LLC. (Ex. 6.) The City issued building permit #103731 for "Tenant Build Out" of the Leased Premises on March 1, 2016. (Ex. 3.) Shortly thereafter, Landlord commenced work through its retained contractor, Caldwell Builders.[11]

At some point in late February 2016, prior to the commencement of construction, Dean Pennington met with Donald Cameron on the Leased Premises; Zac Pennington and Jerry Caldwell, the contractor's representative, were also present. One topic of discussion at this meeting was Landlord's request to Tenant that the contemplated footprint of the finished space be moved leftward, in relation to the plans, in order to take advantage of an existing column wall in the building so that the column wall could be used as a fire wall. Without this leftward shift, the fire wall depicted in the architect's plans conflicted with both a window on the south side of the building and an electrical junction box which had previously been installed inside the north wall. Mr. Caldwell, a construction expert qualified by more than 40 years of experience in commercial and residential construction, testified, without contradiction, the requested leftward shift would have benefitted not only the Landlord, but also would have been advantageous to the Tenant in that Tenant could have increased the HVAC tonnage for the rentable space. Tenants did not challenge Mr. Caldwell's opinion in any manner and the Court accepts his opinion as a finding of fact.

Tenants were unwilling to agree with Landlord's requested change and insisted that the build out be done in strict conformity with the plans prepared by their architect. Mr. Cameron maintained that Tenants bear the expense of relocating the electrical panel which was required in order to remain in compliance with the plans. Tenants did not agree to Landlord's request. When Landlord's electrical sub-contractor, Hosford Electric, completed the work to move and relocate the electrical panels, Cameron Properties declined to pay Hosford Electric and told Hosford to bill the Tenants. Hosford did as Landlord instructed and sent Tenants an invoice (Ex. 4) in the amount of $4,462.48. Tenant refused to pay Hosford's invoice.

---

[11] Testimony of Donald Cameron and Jerry Caldwell.

In keeping with the original design plans, Hosford Electric installed fan control switches on the back / north wall of the Leased Premises. In May 2016, Zac Pennington, who was Tenant's representative on the job site, told Kerry Hosford he wanted all fan control switches to be located in the manager's office located near the front / south side of the Leased Premises. Mr. Hosford told Mr. Pennington that he would move the switches in accordance with his directions, but new plans depicting this changed location would have to be prepared and submitted to the City for approval or else the installation would not pass electrical codes inspection. The City approved the new electrical plans reflecting the change on May 16, 2016. (Ex. 10.) These revised electrical plans (Ex. 10) are materially different from the electrical plans contained in the original set of plans approved by the City on February 16, 2016. (Ex. 6.)

The City requires that approved construction plans are to be kept at all job sites engaged in construction authorized by City building permits. The City considers "final plans" to be those which have been reviewed by the City Department of Building and Neighborhood Services (formerly known as the "Codes Administration"). Such finalized plans provide the basis for the City's final inspections prior to issuance of certificates of occupancy. According to the records filed with the City of Franklin, the first set of plans for this construction project was submitted on January 13, 2016, for which approval was declined on February 3, 2016. The plans were resubmitted February 12, and approved on February 16, 2016. Revised plans were submitted May 4, 2016 and administratively declined. The revised plans were then submitted on May 5, and approval was issued on May 16, 2016. The operative plans for the final building inspection, which determined whether a certificate of occupancy would be issued, were the complete set of plans bearing an approval date of May 16, 2016.[12] Thus, the Court finds May 16, 2016 to be the operative date for calculating the Handover Date pursuant to Section 4 of the Tenant Agreement. Accordingly, the Handover Date under the parties' contract was July 15, 2016, sixty (60) days after May 16, 2016, the date final stamped plans were approved.

Due to the allocation of construction responsibilities in the Tenant Agreement, it was impossible for Landlord to fully complete its obligations prior to handing the premises over to Tenant for Tenant's share of the work. For example, Landlord was required to install electrical plugs, switches,

---

[12] Testimony of Chris Bridgewater, Director, City of Franklin Department of Building and Neighborhood Services.

and covers-work that customarily is done only after the walls have been painted. Tenant maintained responsibility for painting the walls. Similarly, Landlord was responsible for installing sinks and toilets; work that customarily is done only after the walls are painted and baseboards are installed. In addition to painting, Tenant was also responsible for baseboard installation. Nevertheless, the building trades subcontractors who were hired by Landlord attempted to facilitate implementation of this non-standard allocation of responsibility for both parties. For example, Tenant's construction contractor was given access to the leased premises during the time prior to the required Handover Date, even while Landlord's work was not yet completed.

Landlord's electrical sub-contractor, Kerry Hosford, completed the customary rough-in portion of the electrical work and withdrew from the premises in order for Tenant's painters and trim carpenters to perform their portion of the construction work. Mr. Hosford was never instructed to install plugs, switches, covers, or breakers as part of the Landlord's work, notwithstanding the allocation of such work to Landlord in Exhibit C to the Tenant Agreement. Mr. Hosford has done both the traditional rough-in and trim-out work on other jobs and he testified that he anticipated this job would involve the same customary allocation of construction responsibilities. Mr. Hosford left his electrical building permit posted at the job site awaiting the proper time to return and finish the trim-out.[13]

Zac Pennington interpreted Mr. Hosford's withdrawal from the job site as an indication that Mr. Hosford considered his work to be complete. Without conferring with Landlord's construction supervisor, with Mr. Hosford, or anyone else authorized to represent Landlord, Mr. Pennington engaged his own contractor, David Wyles Construction, to install plugs, switches, covers, and breakers; work that was Landlord's responsibility under the Tenant Agreement, prior to installation of Tenant's fixtures. Upon returning to the job site, Mr. Hosford discovered Tenant's contractor working on the site without a separate electrical building permit, doing the work Mr. Hosford had anticipated completing himself. Mr. Hosford removed his permit from the premises and left the job site without returning.

In performing Landlord's electrical work, Hosford Electric installed electrical conduit and positioned terminal boxes for low voltage wiring. Hosford did not pull any low voltage wires, nor did it otherwise perform

---

[13] Testimony of Kerry Hosford.

any low voltage installation. There are two reasons for this: (i) Hosford Electric is not licensed as a low voltage electrical contractor, and (ii) the installation of low voltage wiring is not identified in the Tenant Agreement as part of Landlord's work.

* * *

Contrary to the terms of the Tenant Agreement, Landlord did not install any sinks or toilets. Although Landlord did install drywall, there were portions of the drywall installation around certain window frames that were left incomplete. (Ex. 13.) Tenant did not prevent Landlord from completing these construction tasks. Although the fire wall installation failed earlier codes inspections, Landlord's contractors corrected these deficiencies at Landlord's expense, and the fire wall installation passed subsequent inspections, including the final inspection.

Country Mile and Well North offered into evidence certain invoices from David Wyles Construction, LLC, purporting to show the costs incurred by Tenant in completing the work Landlord had not completed. (Ex. 7.) From the testimony of Zac Pennington, Kerry Hosford, and Jerry Caldwell, as well as the contents of the invoices themselves, the Court concludes the expenses actually incurred by Tenant to complete work allocated under the Tenant Agreement to Landlord are as follows:

a. "Interior Plumbing -- M(Sinks, toilets and plumbing material used in the install of these items)" **$3,474.10**
b. "Interior Plumbing -- S(Labor required to install all sinks and toilets)" **$3,450.00**
c. "Electrical Work -- S(Completed final trim out and panel schedule for the breakers and the main breaker that were required for tenant to install light fixture and other electrical apparatus)" **$9,548.09**
d. "Interior Finishes -- M(Trim work to cover incomplete drywall by Caldwell Builders" **$172.50**
e. "02 00 00.1 -- Existing Conditions -- M(Repairs to drywall due to drywall not being ready for paint. Drywall mud, tape, corner bead, trim and sand paper)" **$243.06**
f. "02 000 00.2 -- Existing Conditions -- L(2 man crew used to the drywall that was left unfinished by Caldwell Builders)" **$1,150.00**

22

Other invoices submitted by Tenants are not compensable because they represent: (a) work arising out of Well North's change orders, and (b) work not allocated to Landlord.

Tenant obtained a certificate of occupancy effective August 1, 2016 (Ex. 11), and opened for business shortly thereafter. Tenant began advertising its anticipated opening by way of signage on the Leased Premises in the fall of 2015, shortly after entering into the Tenant Agreement and well before submitting its building plans to the City for review and approval. This advertising was revised a number of times in order to project later expected opening dates. Eventually, Tenant targeted August 2016 for opening and revised its advertising signage accordingly. Tenant also began telephone solicitation of membership subscriptions as early as January 2016. (Ex. 45.)

The original letter of intent (Ex. 18) anticipated membership pre-sale activity would take place on the premises eight weeks prior to opening for business. A franchisee consultant for Anytime Fitness, Inc. who worked with Zac Pennington, advised Mr. Pennington that a realistic pre-sale goal was to obtain between 200 and 300 membership subscriptions.[14] Well North achieved this goal.[15]

By the time Anytime Fitness opened for business in August 2016, Tenants believed Landlord had breached its obligations under the Tenant Agreement by failing to complete the work allocated to Landlord. Tenants also took the position Landlord had failed to turn the Leased Premises over to Tenants in a timely manner and they were entitled to an abatement of rent under Section 4 of the Tenant Agreement. Therefore, Tenant did not remit any rent payments. Landlord placed Tenants on notice of default by letter dated August 19, 2016, from Robert C. Ashworth, Esq., to Zac and Dean Pennington. (Ex. 5.) Mr. Ashworth advised the Penningtons that Cameron Properties intended to terminate the lease and file a detainer action to recover possession of the Premises unless Tenants cured their default. In addition, Mr. Ashworth's letter conditioned forbearance of a detainer action upon Tenants paying Hosford Electric's May 16, 2016 invoice for relocating the electrical panels; payment of September's rent in advance; and execution of a new lease agreement with additional personal guarantees.

---

[14] Testimony of Zac Pennington.

[15] *Id*. The contents of Ex. 45 do not support Well North's claim for consequential damages.

On August 29, 2016, Thomas Boylan, Esq., Tenants' counsel, replied to Mr. Ashworth and disputed Landlord's claim of breach. (Ex. 33.) Tenants also took the position that "final stamped drawings from City of Franklin were delivered to Cameron Properties on approximately February 21, 2016," and that the certificate of occupancy was issued on August 1, 2016. From these two data points, Tenants asserted they were "well within their right to occupy the building rent free for the first three months of the Lease, which they have elected to do."

Tenants also rejected Landlord's demand for payment of the Hosford Electric invoice and countered that they had incurred $39,302.71 of expense to David Wyles Construction, LLC, for the completion of work assigned to Landlord under the Tenant Agreement. In support of this assertion, Tenants enclosed four invoices from David Wyles Construction, LLC. (Ex. 33.)

## CONCLUSIONS OF LAW

Throughout the course of this action, each of the parties has asserted multiple claims for breach of contract, pursuant to the terms of the Tenant Agreement. In the original detainer action, which began in General Sessions Court, Landlord claimed Tenant breached the Tenant Agreement by failing to pay rent. Pursuant to the terms of the Tenant Agreement, Landlord sought monetary damages, together with interest accrued on the amount owed and attorney's fees. Landlord later added, in its Amended Answer to Tenant's Verified Complaint, a Counterclaim for Rescission of the Tenant Agreement based upon a theory of mutual mistake, as evidenced by the apparent confusion over which entity was, in fact, the Tenant of the Leased Premise.

In its post-trial Proposed Findings of Fact and Conclusions of Law, Landlord recasts this argument in terms other than rescission. Instead, Landlord argues Country Mile directly breached the Tenant Agreement by assigning the Tenant Agreement to Well North without Landlord's authorization. Based on said breach, Landlord seeks to terminate the Tenant Agreement and expel Tenant through a writ of possession, pursuant to Landlord's right set forth in Section 17 of the Tenant Agreement.

In their original action, Tenants assert claims against Landlord for breach of contract. Tenants seek damages for expenses incurred in

completing the Landlord's construction work, as well as consequential damages in the form of lost business revenue. Specifically, Tenants claim that Landlord breached the Tenant Agreement, by failing to hand over the Leased Premises in a timely fashion, which resulted in 83 potential members cancelling or failing to subscribe their membership because of the delay in operation. Tenants submit, as a result of Landlord's delay in construction, that they were entitled to an abatement of the rent.

As an affirmative defense, Landlord contends each of the Defendants lack sufficient standing to bring a claim for breach of contract. Landlord argues that neither Well North nor the Penningtons, in their individual capacities, have standing to bring claims for breach of contract because they are not parties to the Tenant Agreement. Landlord contends the proper tenant, as set forth in the Tenant Agreement, is Country Mile. However, because all of the expenses incurred in completing Landlord's construction work were paid by Well North, Country Mile has not suffered any damages; and thus Country Mile can show no injury capable of being redressed.

## A. Standing

* * *

The Tenant Agreement was entered into by Country Mile and Cameron Properties in September 2015. Cameron Properties agreed to lease the premises to Country Mile for the purpose of operating any [sic] Anytime Fitness franchise on the Leased Premise. (Ex. 1.) At that time, Country Mile owned and operated eleven other Anytime Fitness franchise locations. Country Mile entered into a joint venture with Well North for the purpose of operating the Anytime Fitness franchise located on the Leased Premises.

Country Mile and Well North's relationship was not concealed from Cameron Properties. Rather, Cameron Properties had actual knowledge of Well North's participation in the joint venture. Early on, Cameron Properties knew Zac Pennington was involved in the business and operation of this Anytime Fitness franchise. Someone even attempted, after the fact, to include Zac Pennington's name in the Tenant Agreement. Indeed, Cameron Properties executed waiver and disclaimer agreements with Key Equipment Finance in order to facilitate Well North's financing of exercise equipment to be installed and used on the Leased Premises. (Ex. 2.)

25

Cameron Properties was fully aware of the fact that Well North was going to operate the Anytime Fitness business on the Leased Premises. There is no evidence that Cameron Properties attempted to amend the Tenant Agreement, or the guarantee to conform to the reality of Country Mile's joint venture with Well North until Cameron Properties made its demand that Tenants cure the rent payment default from August 2016. (Ex. 5.) Well North's participation in the operation of the Anytime Fitness franchise does not change Landlord's obligations, or make Country Mile's rights under the Tenant Agreement less secure.

## 1. Country Mile's Standing

Cameron Properties argues Country Mile lacks sufficient standing because Well North actually incurred all the costs allegedly expended to fully satisfy Landlord's construction obligations; thus, Country Mile has not sustained any actual damages from Landlord's alleged failures. Cameron Properties also argues Well North is the assignee of the Anytime Fitness franchise agreement, and consequently, that Country Mile cannot claim to have suffered any injury from Cameron Properties' alleged failure to deliver the Leased Premises by the Handover Date. For these reasons, Cameron Properties argues Country Mile lacks standing due to its inability to demonstrate either injury-in-fact or redressability.

Country Mile is the Tenant identified in the Tenant Agreement. Landlord's performance obligations under the Tenant Agreement are contractually owed to Country Mile. Dean Pennington, as a member of Well North and Country Mile, and as guarantor of Country Mile's obligation to pay rent under the Tenant Agreement, has a stake in the success of the business located on the Leased Premises. The ability for the business to succeed hinges upon sufficient completion of the improvements for the Leased Premises.

If Landlord breached its construction obligations, Tenants would be required to perform remedial work in order to mitigate consequential damages. Country Mile could incur the costs of said remedial work directly, in which case it would have a claim for its own loss; or Country Mile could indirectly incur the costs through Well North, in which case Country Mile would still have a claim for compensation to which Well North would be subrogated. Either way, Landlord faces the prospect of liability to Country Mile.

In the present matter, Country Mile has chosen to indirectly incur costs through Well North. Well North has written checks for certain Tenant obligations such as the security deposit and the completion of Tenant's build-out. In doing so, Well North has spent funds which had been contributed to Well North by Mr. Pennington and/or Country Mile. If Well North was spending its own funds, independent of any monetary infusion from Country Mile, Well North would be entitled to reimbursement from Country Mile for expending costs for Country Mile's benefit. Irrespective of how Country Mile and Well North balance their individual accounts with one another, Country Mile has standing to assert a claim against Landlord for damages caused by Landlord's breach of contract.

## 2. Well North's Standing

Relying on the express terms of the Tenant Agreement, Cameron Properties argues Well North is not a party to the Tenant Agreement, has no legally protected interest in Cameron Properties' performance of the Tenant Agreement, and therefore, lacks standing to sue for breach. Tenants respond by arguing Landlord is estopped from denying Well North is a Tenant because it accepted the security deposit check written by Well North, and acknowledged Well North's status as "Lessee" of the Leased Premises in the Equipment Waiver and Disclaimer (Ex. 2.)

In some circumstances, a party may be estopped from asserting contractual defenses in the interest of equity and fairness. Estoppel arises when one party voluntarily acts in a manner inconsistent with rights the party subsequently asserts, and the other party has relied in good faith on those actions to its detriment. *See generally*, 11 Tenn. Juris. ESTOPPEL § 11 (2015). In this case, Well North claims it relied upon Landlord's acceptance of the security deposit and execution of the Equipment Waiver and Disclaimer, and consequently, incurred costs associated with the build-out of the Leased Premises.

Well North's estoppel argument has a certain plausible appeal; however, Well North has not considered the consequences of its assertion. Well North is not arguing it is a Tenant under the Tenant Agreement. Well North does not contend Cameron Properties consented to an assignment of the Tenant Agreement by Country Mile to Well North, nor is it undertaking or assuming liability for making the rent payments. Well North instead

argues Cameron Properties is equitably estopped from denying it is contractually obligated to Well North, and has sued Cameron Properties for direct and consequential damages it contends were caused by Landlord's failure to complete construction work and deliver the Leased Premises on time. Estoppel does not run in only one direction. Well North wants to be treated as equitably entitled to sue for damages. Equity will require Well North bear exposure for liability arising out of Tenants' breach of the Tenant Agreement.

Well North's standing is coextensive with that of Country Mile. Country Mile is a necessary party. Well North could not bring a claim for breach of contract against Landlord without joining Country Mile to the action.

## B. Breaches of Contract

Landlord contends Tenants breached the Tenant Agreement by (1) assigning the Tenant Agreement to Well North without authorization, and (2) improperly abating the rent. Tenant claims Landlord breached the agreement by (1) failing to adequately complete its construction obligations, and (2) failing to meet the Handover Date. The Court concludes: (i) Tenants are entitled to damages from Landlord's failure to complete its allocated portion of construction responsibility; (ii) Landlord did not breach the obligation to hand the Leased Premises over to Tenant in a timely manner; (iii) Tenants breached their obligation to pay rent; and (iv) Landlord is not entitled to cancel the Tenant Agreement.

* * *

## 1. Tenant's Unauthorized Assignment of the Tenant Agreement

The Tenant Agreement, which was signed by Country Mile, lists Country Mile as the "Tenant." Well North was not a party to the original agreement, but later became heavily involved in the operation of the business on the Leased Premises through its joint venture with Country Mile. In furthering the objectives of the joint venture, Country Mile assigned the Anytime Fitness franchise agreement, which originally existed between Country Mile and Anytime Fitness, Inc., to Well North on November 4, 2015. Country Mile had no obligation to obtain Cameron Properties' consent to assign the Franchise Agreement to Well North.

28

Under the terms of the Tenant Agreement, Country Mile agreed "not to assign or sublet" the Leased Premises "or in any other manner transfer the Lease" without Cameron Properties' written consent. (Ex. 1.) The assignment of the franchise agreement is not the same as an assignment of the Lease. The Tenant Agreement does not restrict the business structure employed by the Tenant to operate the business, rather, it restricts only the type of activity permitted on the premises, which in this case is limited to a "24-hour, 7 days per week" fitness center. (Ex. 1.) Even if, as Cameron Properties argues, assigning the franchise agreement was tantamount to assigning the lease, Cameron Properties likewise agreed that its consent to an assignment would not be "unreasonably withheld." (*Id*.) Irrespective of whether an assignment took place, Cameron Properties knew of Well North's involvement in the joint venture. Cameron Properties accepted Well North's check as the security deposit and acknowledged Well North as the "Lessee" in the Equipment Waiver and Disclaimer agreements with Key Equipment Finance. (Ex. 2.) Under these circumstance [sic], it would be unreasonable for Cameron Properties to withhold its consent if Tenants asked for it.

Landlord has no right to cancel or terminate the Lease upon either the Tenants' failure to request consent to the alleged assignment of the Lease to Well North or Tenants' failure to pay rent. As explained *supra*, Landlord is equitably estopped to assert that Country Mile breached the non-assignment clause in its business structure with Well North. Second, Landlord committed the first material breach of the Tenant Agreement by failing to complete Landlord's assigned construction work and therefore cannot enforce the terms of the contract against Country Mile.

* * *

## 2. Landlord's Failure to Complete Construction

Cameron Properties breached the Tenant Agreement by failing to complete the construction work allocated to it by Exhibit C to the Tenant Agreement. Specifically, (a) Landlord failed to complete the installation of drywall, sanded and ready for paint; (b) Landlord failed to install breakers, cutoffs, plugs, connectors, electrical boxes, receptacles and covers needed for Tenant to install its own light fixture or apparatus; and (c) Landlord failed to install all toilets and sinks.

Tenant's damages are measured by the costs incurred in finalizing the work Landlord failed to complete. The proof demonstrates that the total amount of damages caused by Landlord's breach is $18,037.75. Tenants failed to carry their burden of proof that their damages exceeded $18,037.75.

**3. Landlord's Handover of the Leased Premise.**

The Handover Date is the date by which Landlord was required to complete its work and deliver the Leased Premises to Tenant so Tenant can complete its build-out work. This is clear from the terms of Sections 3 and 4 of the Tenant Agreement, which must be read in harmony with one another in order to give proper effect to both. The Court has found, as a matter of fact and law, that the Handover Date defined by Section 4 of the Tenant Agreement was July 15, 2016.

Tenants' argument claiming that the Handover Date was March 16 lacks merit because it ignores the timing of the submission of revised electrical plans, necessitated by Tenants' decision to change the location of the fan control switches. Tenants' argument that the term "final stamped drawings" equates to the initial set of approved construction plans is a non sequitur that ignores factual reality and creates the potential for an absurd result. Tenants' interpretation would allow Tenants to unilaterally prolong the construction process with changes to the plans in order to obtain rent abatement based on the resulting delay, leaving the landlord with no recourse.

In this case, Landlord gave Tenant access to the Leased Premises while Landlord was still within the time window under the Tenant Agreement for Landlord to complete its assigned work. This was necessary due to the parties' overlapping construction obligations. Consequently, the handover in fact happened before Landlord's completion window closed. The Court concludes Landlord did not breach the Tenant Agreement by failing to meet the contractually required Handover Date.

With respect to Tenant's claim for consequential damages, even if the Court ignored the fact Landlord voluntarily provided Tenant access to the Leased Premise prior to the Handover Date in order for Tenant to complete its construction work, and thus held Landlord responsible for delays up to the date of occupancy, Tenant would still not be entitled to any additional damages. Any delay in the Handover Date is limited to the

sixteen day period from July 15, 2016, to August 1, 2016; Tenant's claim for consequential damages is likewise limited to lost business opportunities caused by the sixteen-day delay.

Tenants have failed to carry the burden of proof to demonstrate they sustained consequential damages as a result of Landlord's breach of its contractual obligations. Tenants offered no evidence of any lost business opportunity caused by either the failure to complete construction or the delay between the actual Handover Date and Tenant's occupancy. The evidence is undisputed Well North met the subscription pre-sale goal set for it by Anytime Fitness, Inc.'s franchisee consultant. The term sheet presented to Landlord's negotiating agent only anticipated an eight-week, on-site presale effort before opening. Instead, Tenants began marketing efforts, including advertising and telephone solicitation of membership presales in 2015, well before they submitted building plans to the City for approval. Landlord bears no responsibility for the success or failure of the presale of Tenants' membership subscriptions. In any event, as previously stated, Tenants achieved the presale goal given to them by the franchisor. Tenants have thus failed to prove they actually sustained any consequential damages.

## 4. Tenant's Improper Abatement of the Rent

According to the Tenant Agreement, the duty rested with Landlord to hand over the Leased Premises to Tenant no later than sixty (60) days after the final stamped drawings were received; likewise, Tenants' rent obligation began sixty (60) days after the Handover Date even if Tenant has not yet received its occupancy permit. Tenant was entitled to rent abatement, however, if the Handover was delayed for a minimum of ninety (90) days.

The certificate of occupancy was issued on August 1, 2016, and Tenants immediately opened for business and began operations. Therefore, the provision of the Tenant Agreement granting Tenant a rent abatement for improper delay was never triggered.[16] Thus, Tenant was obligated to pay

---

[16] The Court notes Section 4 of the Tenant Agreement which grants Tenant "1 month free rent" for "every 30 days over the initial 60 days Landlord fails to handover the space," conflicts with Section 5 of the Tenant Agreement which states Tenant's obligation to pay rent is "without deduction, set-off or prior notice or demand." Because the Court finds Tenant received the premises within two weeks of the Handover Date, Tenant's right to "1 month free rent" never arose. Therefore, the Court does not have to resolve the apparent contradiction between Sections 4 and 5. Were the Court required to do so, however,

31

rent starting in August 2016; Tenants breached the Tenant Agreement by failing to remit rent payments beginning at that time. Tenants' rent obligation was not subject to any rights of deduction or set-off. Tenants could only withhold rent if Landlord failed to turn over the Premises within 90 days of the receipt of final stamped drawings approved by the city. Tenants had no right to withhold rent payments notwithstanding the dispute with Landlord over costs incurred in completing the construction work because the Hand Over was not delayed.

\* \* \*

While typical circumstances surrounding a landlord-tenant commercial lease might permit a tenant to abate rent based on the landlord's first material breach of the contract, the plain language of the Tenant Agreement involved in this case illustrates that the parties anticipated such a situation and agreed otherwise. The "First Material Breach" rule does not bar Landlord from suing to collect rent because the payment of rent is expressly agreed to be free from any rights of "deductions" or "set off."

\* \* \*

Consequently, by electing to withhold rent premised upon a faulty interpretation of the contract, Tenants breached an explicit term of the Tenant Agreement, and one which is enforceable irrespective of Landlord's prior breach.

Tenant breached the Tenant Agreement by failing to pay rent for the period spanning August 2016 through December 2016. Tenant has attempted to cure its breach by tendering delinquent rent in the total sum of $42,333.35. Pursuant to Section 23 of the Tenant Agreement, Landlord is entitled to interest at 10% *per annum* on unpaid rent. Since January 2017, Tenant has remitted current monthly rent payments via checks which Landlord has voluntarily chosen not to cash. Landlord is not entitled to interest on rent payments timely remitted. The total sum of all rent payments due and remitted through the date of this Memorandum and Order is $84,666.70 (*See* Notice of Stipulation filed May 15, 2017).

---

the Court would construe the rent abatement in Section 4 to be a provision of specific application, which therefore would take precedence over the general prohibition against deduction or set-off in Paragraph 5.

32

In addition, Landlord is entitled to reimbursement of reasonable attorney's fees incurred "to enforce collection of the rents agreed to be paid, or to enforce compliance with any of the covenants and agreements" in the Tenant Agreement. (Ex. 1.) Thus, Landlord is entitled to reasonable attorney's fees incurred for the purpose of (1) enforcing collection of the rents; and (2) defending against Tenant's claim predicated upon Tenant's incorrect interpretation of the Hand Over Date set out in the Tenant Agreement.

Because the Court concluded Country Mile's joint venture arrangement with Well North, including its assignment of the franchise agreement, was not a breach of the Tenant Agreement, Cameron Properties is not entitled to attorney's fees incurred in its efforts in this litigation seeking cancellation of the Lease predicated upon that theory.

## CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Cameron Properties is entitled to deposit all rent payments previously tendered by Tenants. Cameron Properties is likewise entitled to a judgement [sic] against Country Mile, Well North, and Dean Pennington, as guarantor, jointly and severally for interest at 10% on the delinquent portion of the rent in the amount of **$1,058.27** and reasonable attorney's fees incurred in enforcing collection of the rent.[17]
2. Except with regard to Dean Pennington's status as a guarantor, there being no evidence that Dean Pennington and Zac Pennington acted in any capacity other than through their disclosed limited liability business entities, Cameron Properties' claims against Dean Pennington and Zac Pennington are hereby dismissed pursuant to Tenn. Code Ann. § 48-217-101(a).
3. Country Mile and Well North are jointly entitled to a judgment against Cameron Properties in the total sum of **$18,037.75**, representing damages

---

[17] The monthly rent for the Leased Premises is $8,466.67. (*See* Notice of Stipulation filed May 15, 2017); monthly interest calculated at a rate of 10% *per annum* would thus be $70.56 for every month that the rent is delinquent. The time period during which Tenant remained delinquent on rent payments included the five months between August and December 2016. Therefore, August's rent remained delinquent for five months, accruing to $352.77 in interest; September's rent remained delinquent for four months, accruing to $282.20 in interest; October's rent remained delinquent for three months, accruing to $211.65 in interest; November's rent remained delinquent for two months, accruing to $141.10 in interest; and December's rent remained delinquent for one month, accruing to $70.55 in interest. Thus, the total amount due in interest equals $1,058.27.

incurred in order to remedy Cameron Properties' breach of its construction obligation. Notwithstanding the provisions of Tenn. Code Ann. § 25-1-103, Country Mile and Well North have no right of deduction or set-off against future rent obligations under the Tenant Agreement.

4. Cameron Properties is entitled to a judgment in its favor with respect to Country Mile and Well North's claims seeking damages for Cameron Properties' alleged failure to comply with the Hand Over obligation of the Tenant Agreement. Country Mile and Well North's claim for breach of contract on this alleged ground is dismissed and Cameron Properties is entitled to an award of reasonable attorney's fees incurred in enforcing its rights under the Hand Over provisions of the Tenant Agreement.

5. Not later than twenty-one (21) days following the entry of this Memorandum and Order, Cameron Properties shall submit a request for assessment of its reasonable attorney's fees incurred (i) to enforce the collection of rents; and (ii) enforce its rights under the Hand Over provision. If Country Mile opposes Cameron Properties' fee request, it shall file and serve a written opposition not later than fourteen (14) days following its receipt of Cameron Properties' request. The Court will decide the issue of attorney's fees on the papers without a hearing, unless either party, for good cause, requests to be heard.

6. Costs compiled by the Clerk in the bill of costs pursuant to Rule 54.04(2) are taxed to the parties equally.

7. The cash bond lodged by Country Mile and Well North is hereby released. The Circuit Court Clerk shall return the bond funds to Country Mile and Well North in a check payable jointly to Country Mile, LLC, and Well North, LLC.

8. Cameron Properties' petition for writ of possession is hereby denied.

(footnotes in original but renumbered). By order entered August 25, 2017, the Trial Court awarded Landlord reasonable attorney's fees in the amount of $15,500.00. Landlord appeals to this Court.

## Discussion

Although not stated exactly as such, Landlord raises six issues on appeal: 1) whether Country Mile and Dean have standing to bring the action against Landlord; 2) whether Country Mile and Well North have standing to bring the action against Landlord; 3) whether Dean has standing to bring an action on behalf of Well North; 4) whether Tenants breached the Contract by failing to pay rent; 5) whether the Trial Court erred in awarding judgment against Landlord in the amount of $18,037.75; and, 6) whether Landlord is entitled to an award of all of its attorney's fees. Tenants raise two issues on

34

appeal, which we restate as: 1) whether Landlord timely appealed the detainer action; and, 2) whether dismissal of a complaint for lack of standing may be raised for the first time on appeal.

We first will address the issues raised by Tenants as the holding as to either issue could be dispositive. Tenants ask us to consider whether Landlord timely appealed the detainer action. Tenants argue in their brief on appeal that the detainer action and the breach of contract action are two separate actions which were consolidated only for purposes of trial and that because Landlord failed to timely file an appeal of the detainer action that Landlord has waived issues pertaining to that action. Tenants are mistaken.

The Trial Court entered an order on December 16, 2016 consolidating the detainer action "for all purposes into the [breach of contract action]." The order instructed: "All future filings in this action, or which would have been made in [the detainer action], shall henceforth be made under the caption of [the breach of contract case]." The Trial Court clearly consolidated the detainer action *into* the breach of contract action "for all purposes" making the two cases into one case under one case number, Case No. 2016-471. The Trial Court did not simply consolidate the two cases for purposes of trial. Landlord timely appealed Case No. 2016-471, which included both the breach of contract action and the detainer action. This issue is without merit.

We next consider whether dismissal of a complaint for lack of standing may be raised for the first time on appeal. In their brief on appeal, Tenants assert that the issue of standing was not raised until post-trial in the post-trial proposed findings of fact and conclusions of law filed by Landlord. Tenants are mistaken.

The issue of standing was raised by counsel for Landlord during trial, at which time the Trial Court instructed counsel: "Because of the interlocking, kind of fluid burdens of proof here, we may not be at a clean cut stage anywhere for a Rule 41.02 motion. But at the conclusion of the proof you can certainly submit your legal argument." Counsel for Landlord did just that when submitting its post-trial brief. Furthermore, the Trial Court addressed the issue of standing quite comprehensively in its final judgment. Given all this, we cannot find that the issue of standing was not properly presented to and addressed by the Trial Court.

Additionally, we note that this Court has explained that "because standing 'is a component of subject matter jurisdiction,' Tenn. R. App. P. 13(b) requires us to consider it even if the trial court did not have the opportunity." *In re Lyric A.*, 544 S.W.3d 341, 343 (Tenn. Ct. App. 2017) (quoting *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004)). Thus, Tenants' assertion in their brief on appeal that standing cannot be raised for the first time on appeal is without merit.

As the issues raised by Tenants are not dispositive of this appeal, we now turn to the issues raised by Landlord. Landlord's first three issues have to do with standing. We, therefore, begin our discussion of Landlord's issues by addressing standing. As our Supreme Court has explained:

> The doctrine of standing is used to determine whether a particular plaintiff is entitled to judicial relief. *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976). It is the principle that courts use to determine whether a party has a sufficiently personal stake in a matter at issue to warrant a judicial resolution of the dispute. *SunTrust Bank, Nashville v. Johnson*, 46 S.W.3d 216, 222 (Tenn. Ct. App. 2000). Persons whose rights or interests have not been affected have no standing and are, therefore, not entitled to judicial relief. *Lynch v. City of Jellico*, 205 S.W.3d 384, 395 (Tenn. 2006).

*State v. Harrison*, 270 S.W.3d 21, 27-28 (Tenn. 2008).

In its brief on appeal, Landlord asserts that Country Mile and Dean lack standing to bring the action against Landlord because Country Mile and Dean failed to prove that they suffered any damages or suffered a distinct and palpable injury. Landlord argues that the proof shows that Well North paid the security deposit, Well North paid David Wyles Construction for the work Landlord allegedly failed to complete, and Well North tendered the rent payments to Landlord. As such, Landlord argues that the proof showed that while Well North may have suffered an injury and damages, Country Mile and Dean failed to show that they suffered any injury or incurred any damages.

With regard to this issue, the Trial Court specifically found and held:

> The Tenant Agreement was entered into by Country Mile and Cameron Properties in September 2015. Cameron Properties agreed to lease the premises to Country Mile for the purpose of operating any [sic] Anytime Fitness franchise on the Leased Premise. (Ex. 1.) At that time, Country Mile owned and operated eleven other Anytime Fitness franchise locations. Country Mile entered into a joint venture with Well North for the purpose of operating the Anytime Fitness franchise located on the Leased Premises.
>
> Country Mile and Well North's relationship was not concealed from Cameron Properties. Rather, Cameron Properties had actual knowledge of Well North's participation in the joint venture. Early on, Cameron

36

Properties knew Zac Pennington was involved in the business and operation of this Anytime Fitness franchise. Someone even attempted, after the fact, to include Zac Pennington's name in the Tenant Agreement. Indeed, Cameron Properties executed waiver and disclaimer agreements with Key Equipment Finance in order to facilitate Well North's financing of exercise equipment to be installed and used on the Leased Premises. (Ex. 2.)

Cameron Properties was fully aware of the fact that Well North was going to operate the Anytime Fitness business on the Leased Premises. There is no evidence that Cameron Properties attempted to amend the Tenant Agreement, or the guarantee to conform to the reality of Country Mile's joint venture with Well North until Cameron Properties made its demand that Tenants cure the rent payment default from August 2016. (Ex. 5.) Well North's participation in the operation of the Anytime Fitness franchise does not change Landlord's obligations, or make Country Mile's rights under the Tenant Agreement less secure.

**1. Country Mile's Standing**

Cameron Properties argues Country Mile lacks sufficient standing because Well North actually incurred all the costs allegedly expended to fully satisfy Landlord's construction obligations; thus, Country Mile has not sustained any actual damages from Landlord's alleged failures. Cameron Properties also argues Well North is the assignee of the Anytime Fitness franchise agreement, and consequently, that Country Mile cannot claim to have suffered any injury from Cameron Properties' alleged failure to deliver the Leased Premises by the Handover Date. For these reasons, Cameron Properties argues Country Mile lacks standing due to its inability to demonstrate either injury-in-fact or redressability.

Country Mile is the Tenant identified in the Tenant Agreement. Landlord's performance obligations under the Tenant Agreement are contractually owed to Country Mile. Dean Pennington, as a member of Well North and Country Mile, and as guarantor of Country Mile's obligation to pay rent under the Tenant Agreement, has a stake in the success of the business located on the Leased Premises. The ability for the business to succeed hinges upon sufficient completion of the improvements for the Leased Premises.

If Landlord breached its construction obligations, Tenants would be required to perform remedial work in order to mitigate consequential

damages. Country Mile could incur the costs of said remedial work directly, in which case it would have a claim for its own loss; or Country Mile could indirectly incur the costs through Well North, in which case Country Mile would still have a claim for compensation to which Well North would be subrogated. Either way, Landlord faces the prospect of liability to Country Mile.

In the present matter, Country Mile has chosen to indirectly incur costs through Well North. Well North has written checks for certain Tenant obligations such as the security deposit and the completion of Tenant's build-out. In doing so, Well North has spent funds which had been contributed to Well North by Mr. Pennington and/or Country Mile. If Well North was spending its own funds, independent of any monetary infusion from Country Mile, Well North would be entitled to reimbursement from Country Mile for expending costs for Country Mile's benefit. Irrespective of how Country Mile and Well North balance their individual accounts with one another, Country Mile has standing to assert a claim against Landlord for damages caused by Landlord's breach of contract.

Thus, the Trial Court found that Country Mile and Well North had entered into a joint venture, that Country Mile had incurred costs due to Landlord's breach of its contractual obligations, and that Country Mile had chosen to pay those costs via Well North. The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Trial Court. We find no error in the Trial Court's determination that Country Mile and Dean had standing.

Landlord next asserts that Country Mile and Well North lack standing to bring the action against Landlord. We discussed the issue of standing as to Country Mile above and need discuss it no further. As to Well North's standing, the Trial Court specifically found and held:

**2. Well North's Standing**

Relying on the express terms of the Tenant Agreement, Cameron Properties argues Well North is not a party to the Tenant Agreement, has no legally protected interest in Cameron Properties' performance of the Tenant Agreement, and therefore, lacks standing to sue for breach. Tenants respond by arguing Landlord is estopped from denying Well North is a Tenant because it accepted the security deposit check written by Well

North, and acknowledged Well North's status as "Lessee" of the Leased Premises in the Equipment Waiver and Disclaimer (Ex. 2.)

In some circumstances, a party may be estopped from asserting contractual defenses in the interest of equity and fairness. Estoppel arises when one party voluntarily acts in a manner inconsistent with rights the party subsequently asserts, and the other party has relied in good faith on those actions to its detriment. *See generally*, 11 Tenn. Juris. ESTOPPEL § 11 (2015). In this case, Well North claims it relied upon Landlord's acceptance of the security deposit and execution of the Equipment Waiver and Disclaimer, and consequently, incurred costs associated with the build-out of the Leased Premises.

Well North's estoppel argument has a certain plausible appeal; however, Well North has not considered the consequences of its assertion. Well North is not arguing it is a Tenant under the Tenant Agreement. Well North does not contend Cameron Properties consented to an assignment of the Tenant Agreement by Country Mile to Well North, nor is it undertaking or assuming liability for making the rent payments. Well North instead argues Cameron Properties is equitably estopped from denying it is contractually obligated to Well North, and has sued Cameron Properties for direct and consequential damages it contends were caused by Landlord's failure to complete construction work and deliver the Leased Premises on time. Estoppel does not run in only one direction. Well North wants to be treated as equitably entitled to sue for damages. Equity will require Well North bear exposure for liability arising out of Tenants' breach of the Tenant Agreement.

Well North's standing is coextensive with that of Country Mile. Country Mile is a necessary party. Well North could not bring a claim for breach of contract against Landlord without joining Country Mile to the action.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Trial Court's findings and determination that Well North has standing.

We next consider the issue raised regarding whether Dean has standing to bring an action on behalf of Well North. In its brief on appeal, Landlord argues that Dean does not have standing to bring an action on behalf of Well North because he would have needed to file a derivative action to do so, which he did not. While Landlord may be

correct in this assertion, and we make no finding whether Landlord is or is not correct as to this statement, Landlord has misconstrued the situation in this case. As discussed above, Landlord filed a detainer action in the General Sessions Court against Country Mile, Dean, Zac, and Well North. When Tenants filed their breach of contract action against Landlord, however, the named plaintiffs were Country Mile and Dean. Well North was not a named plaintiff in the breach of contract action brought by Tenants. Thus, Dean has not attempted to bring an action on behalf of Well North. Instead, Landlord brought Well North into the suit by filing the detainer action against it. As discussed above, the appeal of the detainer action then was consolidated into the breach of contract action. As Dean has not attempted to bring an action on behalf of Well North, we find Landlord's argument to be without merit.

The Trial Court discussed the issue of standing quite comprehensively and made specific findings of fact relative to this issue. The evidence in the record on appeal does not preponderate against these findings. Likewise, we find no error by the Trial Court in its application of these findings to the law. As such, we find no error in the Trial Court's holdings as to standing.

We next consider the issue raised by Landlord regarding whether Tenants breached the Contract by failing to pay rent. In its brief on appeal, Landlord argues that because the Trial Court found Tenants had breached the Contract by failing to pay rent that the Trial Court erred in not recognizing Landlord's right to terminate the lease and regain possession of the Premises.

The Trial Court indeed did find that Tenants had breached the Contract by failing to pay rent. The Trial Court, however, also found that Landlord had breached the Contract prior to Tenants breaching the Contract. As such, the Trial Court applied the first breach rule. This Court has discussed the first breach rule stating:

> The Defendants seek to assert the first-to-breach rule, namely: "A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990). We note, however, that "[a] party owed performance may . . . waive its right to assert the first uncured material breach as a bar to recovery on its own subsequent breach." *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 812 (Tenn. Ct. App. 2009). A party "waive[s] its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of the breach." *Id*. at 813. Under some circumstances, a party's failure to assert the "first" breach may not result in waiver. In *Madden Phillips Constr.*, the Court explained this

40

principle and gave examples of situations in which a party's failure to assert a breach may not result in waiver:

> Ordinarily, a party who first materially breaches may not recover under the contract. *United Brake Sys. [v. AEP ]*, 963 S.W.2d [749] at 756 [ (Tenn. Ct. App. 1997) ]. A non-breaching party may nevertheless waive its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of a breach. *Aero Squadron*, 169 S.W.3d at 635–36 (citing 17 Am.Jur.2d *Contracts* § 447 (1964)); *see also SMR Techs., Inc. v. Aircraft Parts Int'l Combs, Inc.*, 141 F.Supp.2d 923, 934 (W.D. Tenn. 2001), *vacated for lack of subject matter jurisdiction*, No. 00–2563, 2004 WL 595010 (W.D. Tenn. Mar. 23, 2004). But there are circumstances where acceptance of contractual benefits does not constitute waiver. For example:

>> *[M]ere efforts on the part of an innocent party to persuade the promisor, who repudiates his agreement, to reject that repudiation and proceed honorably in the performance of his agreement have been held not to involve a waiver of the innocent party's right to avail himself of the breach after the efforts finally prove unsuccessful.* Moreover, it has been held that the fact that a party did not act upon a breach but negotiated with the other party for a new contract does not constitute an acquiescence in the breach where such action was induced by misrepresentation by such other party. A defendant is precluded from claiming a waiver of breach of contract where he fraudulently induces the plaintiff to permit him to continue and thereafter violates the promises he made to induce the plaintiff to give such permission.

> *W.F. Holt Co. v. A & E Elec. Co.*, 665 S.W.2d 722, 733-34 Tenn. Ct. App. 1983) (alteration in original) (quoting 17 Am.Jur.2d Contracts § 447 (1964)).

41

*Id.* at 813. Thus, where a party to a contract fails to assert the other party's breach for reasons such as fraudulent inducement or the party's attempt to convince the breaching party to comply with the contract, the failure to assert the breach may not constitute waiver.

*White v. Empire Express, Inc.*, 395 S.W.3d 696, 715-16 (Tenn. Ct. App. 2012).

The Trial Court found that Landlord was the first to breach the Contract. As such, Landlord is not entitled to damages stemming from Tenants' later breach of the Contract. While Tenants at first did not waive the breach as shown by the fact that they asserted a right to forego payment of rent as a result of Landlord's breach, the Trial Court held, in effect, that Tenants waived Landlord's breach because Tenants continued to accept the benefits of the Contract with knowledge of the breach. The Trial Court's judgment resulted in the Landlord receiving its rent plus interest as provided for by the Contract. Thus, the Trial Court did find that Tenants had breached the Contract, but found that Landlord had breached the Contract first. The Trial Court then ultimately required both Tenants and Landlord to satisfy their respective obligations under the Contract.

Next, we consider whether the Trial Court erred in awarding judgment against Cameron in the amount of $18,037.75. With regard to this issue, the Trial Court specifically found and held:

> Country Mile and Well North offered into evidence certain invoices from David Wyles Construction, LLC, purporting to show the costs incurred by Tenant in completing the work Landlord had not completed. (Ex. 7.) From the testimony of Zac Pennington, Kerry Hosford, and Jerry Caldwell, as well as the contents of the invoices themselves, the Court concludes the expenses actually incurred by Tenant to complete work allocated under the Tenant Agreement to Landlord are as follows:
>
> > a. "Interior Plumbing -- M(Sinks, toilets and plumbing material used in the install of these items)" **$3,474.10**
> > b. "Interior Plumbing -- S(Labor required to install all sinks and toilets)" **$3,450.00**
> > c. "Electrical Work -- S(Completed final trim out and panel schedule for the breakers and the main breaker that were required for tenant to install light fixture and other electrical apparatus)" **$9,548.09**
> > d. "Interior Finishes -- M(Trim work to cover incomplete drywall by Caldwell Builders" **$172.50**

42

e. "02 00 00.1 -- Existing Conditions -- M(Repairs to drywall due to drywall not being ready for paint. Drywall mud, tape, corner bead, trim and sand paper)" **$243.06**

f. "02 000 00.2 -- Existing Conditions -- L(2 man crew used to the drywall that was left unfinished by Caldwell Builders)" **$1,150.00**

Other invoices submitted by Tenants are not compensable because they represent: (a) work arising out of Well North's change orders, and (b) work not allocated to Landlord.

* * *

Cameron Properties breached the Tenant Agreement by failing to complete the construction work allocated to it by Exhibit C to the Tenant Agreement. Specifically, (a) Landlord failed to complete the installation of drywall, sanded and ready for paint; (b) Landlord failed to install breakers, cutoffs, plugs, connectors, electrical boxes, receptacles and covers needed for Tenant to install its own light fixture or apparatus; and (c) Landlord failed to install all toilets and sinks.

Tenant's damages are measured by the costs incurred in finalizing the work Landlord failed to complete. The proof demonstrates that the total amount of damages caused by Landlord's breach is $18,037.75. Tenants failed to carry their burden of proof that their damages exceeded $18,037.75.

Dean asserted during his testimony that Tenants ended up spending $39,000 "exclusively for finishing what Cameron Properties was delinquent in doing." The Trial Court, however, did not award Tenants $39,000 in damages. The Trial Court carefully considered the testimony of Zac, Hosford, and Caldwell along with the invoices submitted and specifically set out in its order exactly which of the alleged charges constituted compensable damages under the Contract. The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Trial Court's findings. We find no error in the Trial Court's determination that: "the total amount of damages caused by Landlord's breach is $18,037.75. Tenants failed to carry their burden of proof that their damages exceeded $18,037.75."

We next consider whether Cameron is entitled to an award of all of its attorney's fees. Landlord contends that it is entitled to attorney's fees pursuant to paragraph 23 of the Contract, which provides:

**23. ATTORNEY'S FEES AND INTEREST.** In the event it becomes necessary for Landlord to employ an attorney to enforce collection of the rents agreed to be paid, or to enforce compliance with any of the covenants and agreements, herein contained, Tenant shall be liable for reasonable attorney's fees, costs and expenses incurred by Landlord, and in addition, shall be liable for interest at ten percent (10%) per annum on the sum determined to be due by reason of breach of this Lease, such interest to run from the date of breach of the Lease, whether or not litigation is involved.

Landlord did have to sue to collect its rent because Tenants improperly attempted to forego payment of rent while accepting the benefits under the Contract. The Contract provided for an award of "reasonable attorney's fees." The Contract does not provide that Landlord is entitled to an award of *all* attorney's fees. The Trial Court did grant Landlord an award of reasonable attorney's fees in the amount of $15,500.00. We note, that in making its award of attorney's fees, the Trial Court correctly considered the factors listed in Tennessee Supreme Court Rule 8, R.P.C. 1.5. In its brief on appeal, Landlord provides no argument whatsoever as to why it should be awarded more than the amount of attorney's fees as found and awarded by the Trial Court as reasonable. This issue is without merit.

## Conclusion

Finding no error, we affirm the Trial Court's May 22, 2017 judgment and August 25, 2017 order awarding attorney's fees. The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Cameron Properties, and its surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE